100 F.3d 243
 72 Fair Empl.Prac.Cas. (BNA) 242, 36
Fed.R.Serv.3d 584
Antonio MARFIA, Plaintiff-Appellee-Cross-Appellant,
v.
T.C. ZIRAAT BANKASI, NEW YORK BRANCH and Ozer Ozman,
Individually and in his official capacity as
General Manager of T.C. Ziraat Bankasi,
New York Branch,Defendants-Appellants-Cross-Appellees.
 Nos. 1347, 1424, 1425, Dockets 95-9064, 95-9066, 95-9142.
 United States Court of Appeals,
Second Circuit.
 Argued April 25, 1996.
Decided Oct. 30, 1996.
 
 Glenn M. Kurtz, New York City (Cyrus Benson III, White & Case, New York City, of counsel), for Defendant-Appellant-Cross-Appellee T.C. Ziraat Bankasi.
 Peter G. Eikenberry, New York City, for Defendant-Appellant-Cross-Appellee Ozer Ozman.
 Herbert Eisenberg, New York City (Davis & Eisenberg, New York City, of counsel), for Plaintiff-Appellee-Cross-Appellant.
 Before: LUMBARD, VAN GRAAFEILAND and MAHONEY, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 T.C. Ziraat Bankasi ("TCZB"), a Turkish bank wholly owned by the Turkish government, and Ozer Ozman, a Turkish national, appeal from a judgment in the amount of $2,274,432 entered in favor of Antonio Marfia in the United States District Court for the Southern District of New York. For the reasons that follow, we vacate the judgment and remand the matter to the district court for further proceedings.
 
 
 2
 Since 1983, TCZB has maintained a branch office in New York City, and from January 1984 until May 29, 1987, Marfia was employed in that office as a Vice President in charge of its Treasury Department. This litigation arises out of Marfia's 1987 termination, which he alleges was discriminatory in nature and in fraudulent breach of a promise of lifetime employment. From 1985 through the date of Marfia's discharge, Ozman was the General Manager of TCZB's New York office, and most of Marfia's charges of wrongdoing were directed against Ozman.
 
 
 3
 Marfia commenced this action on May 31, 1988. On July 7, 1988, White & Case, a landmark New York law firm, which had represented TCZB's New York branch since its inception, answered the complaint on behalf of both defendants. White & Case assumed that separate representation was unnecessary because both defendants took the same position, i.e. that Marfia was terminated because he entered into foreign exchange trades that violated the Bank's trading limits and resulted in a loss to the Bank of over $1 million. As will be discussed below, subsequent events put an end to this community of interests, and Ozman is represented in this appeal by Attorney Peter Eikenberry.
 
 
 4
 The case was assigned originally to Judge Duffy, and the proceedings before him resulted in a judgment by default against Ozman. Following this, the case against TCZB was assigned to Judge Chin who presided at a jury trial. After the jury returned a verdict for Marfia, Judge Chin adjusted the award to eliminate any double recovery and entered a judgment in the amount of $2,274,432. This amount reflected $970,927 in compensatory damages and prejudgment interest, $1 million in punitive damages, and $303,505 in attorney's fees and costs. The total award was incorporated into the interlocutory default judgment against Ozman, and a final judgment for the full amount was entered "jointly and severally" against both Ozman and the Bank. We discuss first Judge Duffy's grant of default.
 
 
 5
 On November 1, 1988, Ozman had triple by-pass open heart surgery at Mount Sinai Hospital in New York City. On December 15, 1988, defense counsel informed Marfia's attorney of the operation and that Ozman would be absent from work for an extended period of time. Notwithstanding this knowledge, plaintiff's attorney, on January 13, 1989, served a notice to depose Ozman on January 30th. On January 20th, defense counsel informed plaintiff's attorney that Ozman would be unable to attend the scheduled deposition because of illness. In subsequent support of this position, defense counsel produced a letter from Ozman's doctor stating that Ozman could resume limited employment as of February 1st, but that he had to avoid stressful situations for at least another month. Interrogation, particularly by an attorney who becomes "outraged" as often as does Marfia's attorney, might well constitute a stressful situation.[1] In any event, the January 30th deposition was cancelled, and the matter of a rescheduled deposition was put in limbo by an ongoing dispute between the attorneys dealing primarily with the production of documents and defense counsel's incomplete deposition of Marfia.
 
 
 6
 On February 1st, plaintiff moved to strike the defendants' answer on various grounds. This motion was denied on May 10, 1989 in a marginally endorsed order which provided in part, "The defendant is ordered to produce Ozman for further [sic] deposition at a time and place to be set by the parties within the next month." Defense counsel attempted to arrange for Ozman's deposition to be taken in accordance with Judge Duffy's order. The following excerpt from a letter written to Marfia's attorney by Laura Hoguet, a White & Case attorney, explains how the date of June 5th finally was agreed upon for Ozman's deposition to commence:
 
 
 7
 I respond to your letters of May 24 and May 27 addressed to Ms. Regal. Since you sent your letters to Judge Duffy, I am sending a copy of this response to him as well.
 
 
 8
 We are and have at all times been ready to go forward with Mr. Ozman's deposition within the time fixed by Judge Duffy, on any date selected by you. Your letter to me dated May 17 proposed deposing Mr. Ozman the week of May 29 or the first week of June; you then insisted that you could not be ready to go forward until June 5, and we have, albeit with difficulty, arranged to have the deposition commence June 5 and continue from day to day thereafter. There is no reason for you to express "outrage" or "annoyance" with Ms. Regal or with me.
 
 
 9
 As for the "exact reason" why Mr. Ozman is leaving the United States: a new manager, Mr. Saffet Avdan, arrived to take over Ziraat's New York branch and Mr. Ozman was recalled to Turkey. He is a Turkish civil servant and I understand, though I am not an authority on this subject, that his legal right to remain in the United States is linked to his employment as Ziraat's manager in New York. We had requested of Ziraat that Mr. Ozman remain here through the week of June 5 so that his deposition could be taken, and Ziraat has given this approval. Again, I think your rights have been fully protected.
 
 
 10
 In March and again in May, Ozman was examined by a number of doctors because of his complaints of illness. In a report dated March 20th, a cardiologist at St. Joseph's Hospital recommended that Ozman "remain at home with limited activities for the next six to eight weeks" and "avoid any undo [sic] stress or exertion."
 
 
 11
 On June 1, 1989, Ozman had another physical examination by a Mount Sinai doctor, who reported in part as follows:
 
 
 12
 Mr. Ozman underwent urgent coronary revascularization because of preinfarction unstable angina on November 1, 1988. His postoperative course was initially complicated by postpericardiotomy syndrome requiring anti-inflammatory treatment. He has evidence of recurrent post-pericardiotomy symptomatology, therefore he will require four weeks of rest starting from the date of this note.
 
 
 13
 Ozman nevertheless appeared for the June 5th deposition. However, it was terminated on June 6th because of his complaints of illness. The following are pertinent excerpts from the uncompleted deposition:
 
 
 14
 Q. Mr. Ozman, how do you feel today, physically?
 
 
 15
 A. WITNESS SPEAKING IN ENGLISH: Not very well.
 
 
 16
 Q. Are you capable of spending several more hours this afternoon?
 
 
 17
 A. WITNESS SPEAKING IN ENGLISH: No.
 
 
 18
 Q. How long do you think you will be able to stay here today?A. WITNESS SPEAKING IN ENGLISH: Maybe half hour more. I'm getting--I'm not feeling well.
 
 
 19
 * * * * * *
 
 
 20
 (LUNCHEON RECESS HELD TO 2:20 P.M.)
 
 
 21
 MR. EISENBERG: Good afternoon. Do you want to make a statement.
 
 
 22
 THE WITNESS SPEAKING IN ENGLISH: Yes. I do not feel well. I cannot continue. I have to leave.
 
 
 23
 MR. EISENBERG: Do you feel better than you did prior to the break?
 
 
 24
 THE WITNESS SPEAKING IN ENGLISH: No.
 
 
 25
 THE WITNESS: I don't feel well.
 
 
 26
 MR. EISENBERG: What time do you think you can be here tomorrow.
 
 
 27
 THE WITNESS: I cannot tell you at this moment now. I don't feel well at the moment.
 
 
 28
 On June 9th, Ozman reported to his doctor again complaining of chest pains and tiredness. The doctor's subsequently prepared affidavit concerning this examination reads in pertinent part as follows:
 
 
 29
 2. On June 9, 1989 Ozer Ozman came to my office complaining of pains in his upper left chest and tiredness. I reviewed copies of medical records he brought with him which revealed that he had had open heart surgery on November 1, 1988. I understood from him that his surgeon, Dr. Arisan Ergin, was on vacation. I had previously seen Mr. Ozman once before, on April 11, 1987 on a matter unrelated to his heart.
 
 
 30
 3. I examined the results of a recent Thallium Stress Test, which Mr. Ozman had brought with him, which were detailed in a report dated May 24, 1989. (A copy of this report is attached as Exhibit A). Mr. Ozman's Thallium Stress Test was suggestive of ischemia. Ischemia is a condition where a certain part of the heart muscle is not getting sufficient blood.
 
 
 31
 4. The suggestion of ischemia could be caused by an anatomical problem, such as a narrowing of a blood vessel, or by stress. Since he had had open-heart surgery in November, in my opinion it was the safest course medically to treat the matter as an anatomically induced problem.
 
 
 32
 5. If Mr. Ozman were to expose himself to stress, physical or emotional, assuming the ischemia symptomatology is anatomically caused, he would risk further anatomical damage to the blood vessels, including a possible vessel closure and heart attack. Emotional stress can be as harmful as physical stress in this situation and may even be more so.
 
 
 33
 6. It is my medical opinion that for the above reasons, Mr. Ozman should have one month of rest from the date I saw him, and avoid physical or emotional stress of any kind during this period, and that he should be re-evaluated at least at the end of that period, if not earlier, by his cardiologist.
 
 
 34
 The above medical reports were before Judge Duffy when, on September 19, 1989, he granted a default against Ozman. Also before Judge Duffy was an affidavit by Ozman dated June 16, 1989, in which he stated in pertinent part:
 
 
 35
 14. I am a Turkish citizen, in the United States on a visa. My visa expires on July 3, 1989. (A copy is attached as Exhibit E.) Therefore, I must return to Turkey by that time. I have made arrangements to leave New York for Turkey on July 2, 1989.
 
 
 36
 15. My lawyers advised me several months ago, before my deposition began, that if I was required to return to Turkey it should be possible to have my deposition taken there if I was unable to return to New York for deposition. I will make myself available for deposition in Turkey when I am well enough. I am also willing to return to New York to continue my deposition here when I am well enough if I am able to obtain the necessary visa and authorization from my employer, but I am not personally in a financial position to pay for my travel expenses and accommodations myself.
 
 
 37
 16. With respect to the matter of my appointment calendars, I threw them away some time in April, to the best of my recollection, along with many other personal possessions as I was getting ready for my eventual return to Turkey. I did not realize when I threw them out that they had been demanded to be produced in this lawsuit.
 
 
 38
 17. I had been advised by White & Case previously that all documents related to this case must be preserved and also all documents that the plaintiff had demanded. However, I was not aware that my personal appointment calendars were included.
 
 
 39
 It is against the foregoing background that we look to Judge Duffy's statement of the facts upon which he based his order of default. The pertinent portion of Judge Duffy's order reads as follows:
 
 
 40
 On February 2, 1989, Marfia filed a motion pursuant to Fed.R.Civ.P. 37 for an order striking defendants' pleadings or, in the alternative, imposing sanctions together with an order compelling defendants to disclose documents requested by Marfia. By endorsement dated May 10, 1989, I ordered that the documents in issue be produced and that Ozman appear "for further deposition at a time and place to be set by the parties within the next month. If the parties are unable to agree the Court will set a time and place." In a companion endorsement of the same date, I denied defendants' motion for a protective order and assessed attorneys fees in the amount of $500 against counsel. Marfia now moves pursuant to Fed.R.Civ.P. 37 for an order to strike defendants' answer and for sanctions for Ozman's failure to comply with my May 10, 1989 order.
 
 
 41
 * * * * * *
 
 
 42
 Ozman's deposition is plainly crucial to Marfia's case. For various reasons asserted by Ozman's counsel, including the aftereffects of Ozman's heart surgery in November 1988, Ozman's deposition was rescheduled numerous times. The deposition has now apparently been put off indefinitely because Ozman was terminated from Bankasi, has returned to Turkey and declared his intent to remain there, and has commenced suit in Turkey against Bankasi. Moreover, it appears that Ozman has destroyed certain documents that were requested by Marfia.
 
 
 43
 Considering the entire record of this case and the fact that this is the second time that Marfia has had to resort to bringing a Rule 37 motion before me, I am left with no other conclusion than that Ozman's conduct is in bad faith. Striking Ozman's answer is particularly appropriate here because it appears that Ozman, rather than counsel, is responsible for the offending conduct.
 
 
 44
 (Citations omitted.)
 
 
 45
 The reader will note that Judge Duffy said nothing at all about the merits of Ozman's claims of illness, or the undisputed medical reports that were presented to him. Instead, he made the clearly erroneous statement that for various reasons, "including the aftereffects of Ozman's surgery," his deposition was "rescheduled numerous times." Ozman's deposition was rescheduled only once at the request of his counsel--that was on January 20, 1989. Judge Duffy's next observation that Ozman's deposition "has now apparently been put off indefinitely because Ozman was terminated from Bankasi, has returned to Turkey and declared his intent to remain there" completely overlooks Ozman's statement of availability contained in his affidavit of June 16, 1989. As will be discussed infra, more than five years elapsed between Judge Duffy's order of default and the commencement of trial, during which time Ozman's testimony could have been taken a hundred times over.
 
 
 46
 The judge did not identify the "certain documents" that Ozman destroyed, which were his diaries, and completely ignored Ozman's assertions that the diaries were destroyed in good faith in anticipation of his return to Turkey.
 
 
 47
 Finally, the imputation of bad faith to Ozman, because Marfia "had to resort" to two Rule 37 motions, unfairly blames Ozman for the first motion which involved a dispute between the attorneys over Marfia's wide-ranging demands for discovery and production of documents. Most of the documents at issue were not even in Ozman's possession; they were in the possession of the Bank, Ozman's former employer.
 
 
 48
 In Cody v. Mello, 59 F.3d 13, 15 (2d Cir.1995), we said:
 
 
 49
 This Court has expressed on numerous occasions its preference that litigation disputes be resolved on the merits, not by default. See, e.g., Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir.1993); Traguth v. Zuck, 710 F.2d 90, 94 (2d Cir.1983); Meehan v. Snow, 652 F.2d 274, 277 (2d Cir.1981). We have recognized that " 'dismissal is "a harsh remedy to be utilized only in extreme situations." ' " Colon v. Mack, 56 F.3d 5, 7 (2d Cir.1995) (quoting Jackson v. City of New York, 22 F.3d 71, 75 (2d Cir.1994) (quoting Harding v. Federal Reserve Bank of New York, 707 F.2d 46, 50 (2d Cir.1983) (quoting Theilmann v. Rutland Hosp., Inc., 455 F.2d 853, 855 (2d Cir.1972)))). Similarly, we have described default judgments as " 'the most severe sanction which the court may apply.' " Securities & Exchange Comm'n v. Management Dynamics, Inc., 515 F.2d 801, 814 (2d Cir.1975) (quoting Trans World Airlines, Inc. v. Hughes, 332 F.2d 602, 614 (2d Cir.1964)).
 
 
 50
 In addition to the cases cited in Mello, there are decisions in numerous other Second Circuit cases in which the same equitable and judicious course of action is advocated. In Gill v. Stolow, 240 F.2d 669, 670 (2d Cir.1957), where a defendant failed to attend a deposition because of alleged ill health, we said:
 
 
 51
 The proper disciplining of a party under circumstances of default is one of those necessary, but troublesome, questions which usually must be left to the control of the trial judge in the course of his administration of his court. Reluctant as we are to interfere, we feel that this is an occasion where, viewed with the hindsight afforded us by a study of the entire record, the penalty assessed is too drastic and the case must be returned to accord defendants a trial of the seriously contested issues of fact involved. In final analysis, a court has the responsibility to do justice between man and man; and general principles cannot justify denial of a party's fair day in court except upon a serious showing of willful default.
 
 
 52
 In Independent Prods. Corp. v. Loew's Inc., 283 F.2d 730, 733 (2d Cir.1960), we said: "The dismissal of an action with prejudice or the entry of a judgment by default are drastic remedies, and should be applied only in extreme circumstances."
 
 
 53
 Similar references to the "most 'drastic remedy,' " (Peterson v. Term Taxi Inc., 429 F.2d 888, 891 (2d Cir.1970)), used "only in extreme circumstances," (Ali A. Tamini v. M/V Jewon, 808 F.2d 978, 980 (2d Cir.1987)), and "as a last, not a first resort," (Katz v. Morgenthau, 709 F.Supp. 1219, 1225 (S.D.N.Y.), aff'd in part, rev'd in part on other grounds, 892 F.2d 20 (2d Cir.1989)), can readily be found among the cases in this circuit. Other cases have described default dismissals as "too harsh," (United States v. "Firmatron By Norruth", 324 F.2d 497, 498 (2d Cir.1963)), and "too severe," (Producers Releasing Corp. De Cuba v. PRC Pictures, Inc., 176 F.2d 93, 96 (2d Cir.1949)). "This court has never hesitated to reverse the denial of a motion to vacate a default judgment where further factfinding was necessary to ensure that substantial justice was served." Davis v. Musler, 713 F.2d 907, 916 (2d Cir.1983).
 
 
 54
 We believe that the reasoning in the above-cited cases is applicable in the instant case, particularly since the district judge who utilized the weapon of last resort five years prior to the date of trial did so in reliance upon a misunderstanding of crucial facts. Like the court in Gill, supra, we have "the responsibility to do justice between man and man." We would be derelict in our performance of this responsibility if we permitted the $2,274,432 judgment to stand in the instant case.
 
 
 55
 There are additional reasons why the judgment as it applies to the Bank must be reversed, and they require a more detailed statement of the facts than is contained in the above paragraphs. As stated above, Marfia contends that he was discharged by Ozman because of his age and his Italian heritage. The Bank denies these accusations and asserts that during a three-week period between September 30 and October 20, 1986, Marfia effected overnight trades which exceeded the Bank's authorized limit by $30 million and resulted in a loss to the Bank of over $1 million. When the Bank's Directors learned of these trades and the resultant loss, they instructed Ozman to discharge Marfia, which he did on May 29, 1987.
 
 
 56
 Ozman was hospitalized for open heart surgery in November 1988. On February 23, 1989, the Bank's home office in Turkey attempted to notify him that he was being transferred to the home office. Because Ozman refused to accept service of the notice of transfer, the Bank had to effect service through the Turkish consulate in New York. Ozman refused to follow the Bank's instructions. Instead, he stopped completely his sporadic appearances at the office. Moreover, he failed to even communicate with the Bank to explain his actions.
 
 
 57
 In March 1989, the Bank's home office sent a new manager, Saffet Avdan, to take over Ozman's job as Manager of the New York Bank. On July 2, 1989, one day before Ozman's visa expired, he returned to Turkey where he sued the Bank alleging improper treatment in connection with his recall to Turkey. These facts were communicated to Judge Duffy by affidavit of White & Case counsel. She advised the court that Ozman's conduct did not appear to be within the control of the Bank, and that, because White & Case's relationship with Ozman had been affected adversely, it had attempted without success to secure Ozman's permission to withdraw as his legal representative.
 
 
 58
 On June 19, 1989, Saffet Avdan, Ozman's successor as General Manager, executed an affidavit for the district court in which he stated in part:
 
 
 59
 7. I am informed and believe that, on June 15, 1989, the head office in Ankara was served with notice that Mr. Ozman has brought a suit against Ziraat in Turkey arising from his reassignment.
 
 
 60
 8. The New York Branch and Ziraat have no control over Mr. Ozman or his actions and are not able to control his availability for his deposition. They have been without any effective means of control over him since at least April 8, 1989 when he declined to accept the order to return to Turkey.
 
 
 61
 9. For these reasons I respectfully request that this Court not penalize defendant T.C. Ziraat Bankasi, New York Branch for any action of Ozer Ozman which the Court may find to have been improper or in violation of discovery procedures.
 
 
 62
 On April 9, 1990, Fahretten Ozen, a Turkish attorney and "Legal Advisor" of TCZB, executed an affidavit in which, after reciting pretty much the same history, he said:
 
 
 63
 15. For the reasons set forth above, TCZB has been unable to control Mr. Ozman's actions in connection with the present lawsuit. These circumstances have made it impossible for TCZB and Mr. Ozman to collaborate in a joint defense and have also resulted in conflicting interests for TCZB and Mr. Ozman in the present lawsuit.
 
 
 64
 Both Marfia's counsel and the district court have recognized the inability of the Bank to control Ozman:
 
 
 65
 That Bankasi could not control Ozman is apparent from Ozman's discriminatory treatment of plaintiff.
 
 
 66
 Plaintiff's Memorandum of Law dated November 28, 1994.
 
 
 67
 White & Case's motion for permission to withdraw from representing Ozman is granted. Ozman has refused to cooperate in the defense of this case. He apparently brought two lawsuits against the Bank in Turkey. Not only have his actions and inactions in the present lawsuit resulted in a default judgment against him, he has continued to refuse to cooperate with the Bank and White & Case. His action and inactions have prejudiced the Bank's defense of the case. Ozman's refusal to cooperate is sufficient reason to allow White & Case to withdraw.
 
 
 68
 874 F.Supp. at 563 (footnote omitted).
 
 
 69
 Unfortunately, certain language in the interlocutory judgment of default created some confusion in Judge Chin's mind and led to a series of highly prejudicial rulings on his part. In the caption of the complaint in the instant action, Ozer Ozman is named "Individually and in his official capacity as General Manager of T.C. Ziraat Bankasi, New York Branch." The default judgment that plaintiff's attorney presented for Judge Duffy's signature provided that plaintiff shall have judgment against Ozman "individually and in his official capacity as general manager of T.C. Ziraat Bankasi, New York Branch." In reliance upon the quoted language, Marfia moved for summary judgment against the Bank. Judge Duffy denied the motion, stating, "The default taken established nothing."
 
 
 70
 When the case was reached for trial, the Bank argued that Judge Duffy's above-quoted ruling meant that the default could not be used against the Bank. 874 F.Supp. at 566. Plaintiff's counsel argued on the other hand that Judge Chin should make findings of fact based on Ozman's "admissions" and read them to the jury with instructions that the jury draw all reasonable inferences in favor of the plaintiff. Id. It goes without saying that whatever Judge Duffy meant when he said that the default "established nothing" should have been the law of the case. Judge Chin stated, however, that it would not be productive to speculate what Judge Duffy had in mind. Id. at 567. Instead, he opted for what he believed would be the "right and fair result," which would be "somewhere in between the two positions taken by the parties." Id.
 
 
 71
 We know of no authority that empowered Judge Chin to put Judge Duffy's ruling to one side and decide for himself what was "right and fair." Perhaps this ruling would not have been prejudicial if Judge Chin had interpreted correctly the facts and the law. However, he erred in both respects.
 
 
 72
 His most crucial factual misstatement was that "Ozman was the General Manager of the Bank during the events leading up to the entry of the default judgment against him." Id. at 562. It might be argued that some form of employer-employee relationship survived Ozman's refusal to return to Turkey, as he was directed to do in February 1989, and his complete isolation from his job and his employer during his subsequent stay in the United States. However, he was replaced as General Manager no later than April 3, 1989. Moreover, it was convincingly established that during all this time the Bank had no control over Ozman. Judge Chin was clearly wrong when he said:
 
 
 73
 Here, Ozman's misconduct occurred in the course of his employment; it was certainly part of his duties as General Manager of the New York Branch to participate and assist in the defense of this lawsuit.
 
 
 74
 Id. at 568.
 
 
 75
 We are dealing in the instant case with possible implied authority, not apparent authority:
 
 
 76
 Implied authority may be viewed as "actual authority given implicitly by a principal to his agent" or as a "kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers." Lind v. Schenley Industries, Inc., 278 F.2d 79, 85 (3 Cir.1960) (applying New York Law).
 
 
 77
 Masuda v. Kawasaki Dockyard Co., 328 F.2d 662, 664-65 (2d Cir.1964). Judge Chin refers on several occasions to alleged holding out. 874 F.Supp. at 560. Holding out is an essential element of apparent authority.
 
 
 78
 Apparent authority is based on the principle of estoppel. It arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess. If a third person holds the reasonable belief that the agent was acting within the scope of his authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized.
 
 
 79
 Masuda, 328 F.2d at 665. Because the doctrine of apparent authority is based somewhat on the theory of estoppel, proof of holding out, standing alone, does not suffice for recovery. There must be proof of reliance and change of position. Greene v. Hellman, 51 N.Y.2d 197, 204, 433 N.Y.S.2d 75, 412 N.E.2d 1301 (1980); Wen Kroy Realty Co. v. Public Nat. Bank & Trust Co., 260 N.Y. 84, 91-92, 183 N.E. 73 (1932); Walsh v. Hartford Fire Ins. Co., 73 N.Y. 5, 10 (1878); 2A C.J.S. Agency §§ 162, 163. There is no such proof in the instant case. We are left, therefore, with the doctrine of implied authority.
 
 
 80
 In New York, a master is not responsible for the wrongful acts of his servant who was not subject to the actual or potential control of the master when the wrongful acts took place. Lundberg v. State of New York, 25 N.Y.2d 467, 472, 306 N.Y.S.2d 947, 255 N.E.2d 177 (1969) (mem.); Moritz v. Pines Hotel, Inc., 52 A.D.2d 1020, 1020, 383 N.Y.S.2d 704 (1976). The district court simply ignored this well-established doctrine. Moreover, the servant's act must have been done " 'with a view to the furtherance of [the master's] business and the master's interest.' " Sauter v. New York Tribune, Inc., 305 N.Y. 442, 445, 113 N.E.2d 790 (1953) (quoting Mott v. Consumers' Ice Co., 73 N.Y. 543, 547 (1878)). It would be a travesty to hold that Ozman's actions in connection with his deposition were performed with the intent of furthering TCZB's interests. " 'A power to act for another, however general its terms, or wide its scope, presupposes integrity and faithfulness in its exercise....' " Wen Kroy, 260 N.Y. at 89, 183 N.E. 73 (quoting Porges v. United States Mortgage & Trust Co., 203 N.Y. 181, 190, 96 N.E. 424 (1911)).
 
 
 81
 In sum, it was error to hold TCZB liable for Ozman's litigation conduct under the doctrine of either implied or apparent authority. The prejudice resulting from this error is obvious.
 
 
 82
 Judge Chin, in his pursuit of a "right and fair" result, decided what "admissions" resulting from the default should be read to the jury by both the court and plaintiff's counsel. Among others, Judge Chin selected the following:
 
 
 83
 Throughout his tenure at the Bank, plaintiff performed his assigned duties as Vice President and subsequently as Senior Vice President of the Bank in an efficient and competent manner.
 
 
 84
 Throughout his tenure with the Bank, plaintiff's actions in his capacity as Treasurer of the Bank were made with the knowledge of his superiors, who were made aware of plaintiff's actions, in his official capacity, within a week of their occurrence.
 
 
 85
 During his tenure, plaintiff facilitated the Bank's ability to maintain a profitable international banking presence in New York City with a respectable and commendable reputation.
 
 
 86
 The job description for employment as Treasurer for the Bank and the nature of that employment included engaging in speculative investment and trading.
 
 
 87
 Over the course of his tenure with the Bank, plaintiff engaged in such speculative investment and trading in such a manner that his actions were profitable for the Bank and he earned, in his official capacity, profits for the Bank of more than $3 million.
 
 
 88
 Ozman, as an agent of the Bank made representations to plaintiff concerning the Bank's intention to maintain an employment relationship with plaintiff for the duration of his professional life.
 
 
 89
 874 F.Supp. at 568-69 (citations omitted).
 
 
 90
 To say that Marfia's attorney read these "admissions" with relish and embellishments is to put it mildly indeed. Judge Chin's statement that the Bank "will be permitted at trial to impeach Ozman's Admissions and to rebut plaintiff's claims," id. at 570, substantially overstated the reality of the situation. How, for example, could the Bank refute Marfia's testimony about Ozman's alleged offer of a lifetime job if Ozman was not permitted to testify? How could the Bank defend against Marfia's claims that Ozman made scurrilous ethnic comments to him when the district court's same adverse ruling was in effect?[2] Indeed, the bulk of the Bank's defense was related in some way to Ozman's conduct and statements, and the court precluded the Bank from offering any evidence of this nature. See id. at 565.
 
 
 91
 To sum up, we conclude, after reviewing the entire record of this seven-year litigation, that the grant of default was a prejudicial abuse of discretion. We hold further that TCZB was deprived of a fair trial to its great prejudice. We vacate both the final judgment and the interlocutory order and judgment of default and remand to the district court for further proceedings consistent with this opinion.
 
 LUMBARD, Circuit Judge, concurring:
 
 92
 I concur in the result vacating the judgment of the district court and remanding the case for further proceedings, and write separately because I believe the conduct of the parties and their counsel was the cause of the errors below.
 
 
 93
 The entry of the default judgment was an abuse of discretion. Dismissal "is a drastic remedy that should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir.1988) (citation and internal quotation omitted). Ordinarily it is imposed only after notice that such a sanction might result from a litigant's conduct. See Simmons v. Abruzzo, 49 F.3d 83, 88 (2d Cir.1995); Bobal v. Rensselaer Polytechnic Inst., 916 F.2d 759, 764 (2d Cir.1990), cert. denied, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991). Neither Ozman's refusal to complete his deposition because of his poor health, his return to Turkey because of his visa expiration and his contradictory statements regarding the anticipated date of that return, nor his allegedly unwitting destruction of documentary evidence, was so extreme as to merit divesting him of his opportunity to defend this suit on the merits without prior warning. Because we vacate the default judgment, it follows that the evidentiary rulings based thereon--and the judgment tainted by them--must fall.
 
 
 94
 All the parties engaged in conduct designed to frustrate a determination of the issues in this case. Their conduct would try the patience of any district judge. TCZB refused to make provisions for Ozman to remain in, or return to, the United States to complete his deposition, which obviously was essential to Marfia's case, only to attempt later to call him as a witness on its behalf at trial. TCZB also sought virtually on the eve of trial to add witnesses and documentary evidence to the pretrial order, in clear violation of Judge Chin's orders. Ozman himself provided changing and conflicting stories as to his availability in and after June of 1989 to complete his deposition. Only ten days after indicating that he would return to Turkey for a temporary visit in mid-July, he informed the court that he would return to Turkey on July 2 for an indefinite period. As for Marfia, his counsel in general adopted a belligerent approach toward his adversaries throughout the litigation; counsel also made comments at trial suggesting that a negative inference be drawn from Ozman's absence, an absence which counsel himself procured.
 
 
 95
 The consequence is that, after all these unnecessary, time-consuming activities over a period of eight years, we now remand the case to the district court for the parties to begin anew.
 
 
 
 [1]
 See, e.g., Trial Transcript at 759 ("I think it is an outrage."); id. at 955 ("I am just outraged.")
 
 
 [2]
 Judge Chin's statement that Ozman "was not available to be called at trial," id. at 568, is technically true but is misleading nonetheless in that Ozman's unavailability resulted from Judge Chin's order. The record discloses that, right up to the date of trial, Ozman asserted his willingness to testify. Indeed he had made airplane and hotel reservations in contemplation of coming to New York for this purpose