CHARVET S.A., Plaintiff,

v.

DOMINIQUE FRANCE, INC., Defendant.

No. 81 Civ. 6139.

United States District Court, S.D. New York.

July 27, 1983.

Amster, Rothstein & Engelberg, New York City, for plaintiff; Jesse Rothstein, New York City, of counsel.

Colvin, Miskin, Basseches & Mandelbaum, New York City, for defendant; Howard C. Miskin, Howard F. Mandelbaum, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Charvet, S.A., a French corporation ("the French Company or Charvet-Paris"), commenced this action against the defendant, Dominique France, Inc., a New York corporation ("the New York Company or Charvet-New York"). The litigation centers about the right to the use in the United States of the trademark "Charvet et Fils," "Charvet," and other variations on custom and ready made shirts for men and women and accessories of high quality, with each side contending it has the sole and exclusive right thereto. Each charges the other with trademark infringement, Lanham Act violations,[1] unfair competition at common law and dilution of trademarks under New York law.[2] Plaintiff also seeks cancellation of trademark registrations held by defendant.

Plaintiff is presently engaged in business at 8, Place Vendome, Paris, France, in which area its predecessors also conducted the same type of custom shirt and haberdashery business as far back as 1837, when it was founded by Ch. Charvet, who used

the trade name and trademark of Charvet. In approximately 1908, the firm adopted the name Charvet & Fils.

For a period of twenty years, from 1899 to 1919, John R. Woone ("Woone"), a nephew of Edouard Charvet, son of the founder, acted as the sole representative of the French firm in the United States. This relationship was changed in March 1919 when Edouard Charvet and his son Paul, then constituting the French firm, entered into an agreement with Woone which authorized Woone to form a corporation in the United States to engage in "a general business similar to that of the French firm and which said corporation shall succeed him [Woone] as the sole representative of the French firm in the United States ...." Under the agreement the French firm consented "to the use of the name Edouard Charvet & Fils, Inc. by such American corporation." The agreement also provided for the payment of commissions to the American firm on orders received by the French firm from American customers and the terms upon which the French firm would sell to the American firm both finished and unfinished goods. Finally, the agreement provided it would be binding on the successors of both companies.

Woone formed Charvet & Fils, Inc. as authorized by the agreement and commenced a retail, custom shirt and haberdashery business on Fifth Avenue and 52nd Street, New York City, similar to the Charvet operation in Paris. The corporation adopted a letterhead containing the logo style and trademark Charvet as used by the Paris company, and the Royal Warrants[3] previously awarded to the Paris company and also listed its Paris address.

In April 1921 Edouard and Paul Charvet sold their interest in the French company to a partnership, Ragon & Delostal. The

---

1. 15 U.S.C. § 1125(a).

2. N.Y.Gen.Bus.Law § 368–d.

3. A royal warrant is granted to a tradesman who supplies goods to a member of the British royal family. The holder of a royal warrant has the right to display the royal coat of arms. In 1869, Charvet was appointed "chemisier [i.e., shirtmaker] in Paris" to Edward VII when he was Prince of Wales and later was appointed "hosier and glover in Paris" to Edward VII after he had become king.

agreement transferred all the French firm's assets (with the exception of its lease), including the "good will ... logo and trade name and the right to call itself successor to the company 'Ed. Charvet & Fils.'" Ragon & Delostal agreed to be bound by the 1919 contract with Woone.

Each company, the Ragon group in Paris and Woone, in New York City, conducted their respective businesses separately and each used the trademark Charvet on different sides of the Atlantic. The Paris group sold merchandise to United States customers who called at its store and delivery of their purchases was made to either a hotel or vessels enroute to the United States. In other instances, the individual customers mailed orders to the Paris firm from the United States and shipments were made in response.

Central to the claims of the parties is the 1919 agreement; however, the nature of the rights granted and obligations assumed thereunder soon became the subject of a dispute, initially between Woone and Ragon, and thereafter between those who succeeded to their respective interests. The acts and conduct of the original parties to the agreement and later those of their successors emphasize their differing constructions. Plaintiff contends that with respect to the mark, only a limited right was granted, whereas defendant claims an absolute right. Indeed, the plaintiff makes no contention that there was any violation of its rights under the agreement from its execution up to the late 1970's and concedes that up to that date the defendant was operating within the scope of the agreement. However it contends that thereafter the defendant abandoned the mark. The little we know about the relationship between the two firms during these early years comes from a series of letters between them dating from the period 1919 to 1932. These letters show that while the two firms cooperated to some extent, there were also frequent controversies between them. The cooperation consisted of the New York firm sending to the Paris firm the measurements and information on the credit worthiness of customers who wanted to buy custom shirts from the French firm. The controversies centered primarily about the provisions in the 1919 agreement concerning the commissions to be paid to the American firm on sales to Americans by the French firm and the terms on which the New York firm could purchase materials and products from the French firm. Indeed it appears that these provisions were honored more in breach than in observance.

A controversy surfaced even during this early period about the New York firm's right to the Charvet mark; in 1930 Woone complained to Ragon that he had been informed that salespersons in the Paris store told customers who purchased there that the American company had no right to use the name "Charvet." Woone and Ragon thereupon had further communications as to the 1919 agreement, but each adhered to his different view of its terms and they failed to reach any accommodation. Nothing further ensued until 1945 when Woone, contending that under the 1919 agreement the United States firm had "purchased" the trademark Charvet and its good will, engaged the law firm of Simpson Thacher & Bartlett to apply to the United States Patent and Trademark Office for registration of the "Charvet et Fils" and "Charvet & Fils" marks for use on shirts and other apparel. Two registrations were granted in due course.[4] Woone died several years later.

Leo E. Cerruti, the chief executive officer and owner of Dominique France, a New York corporation, entered upon the scene in September 1954. Cerruti purchased from Woone's estate the entire stock ownership of Charvet & Fils, Inc., which was later merged with Dominique France.

In 1955, Cerruti applied for and in 1956 was granted two additional United States trademark registrations for Charvet and Charvet et Fils. In 1969 he obtained two more registrations. These four registrations are for use on a broad range of appar-

---

4. The two registrations obtained by Woone are no longer in force.

el and accessories, including ties, mufflers, handkerchiefs, shirts and other items. Cerruti recorded the registrations with the United States Customs Office as part of an enforcement effort, about which more hereafter.

The first contact Cerruti had after purchasing the interest in Charvet & Fils of New York with the French firm of Ragon & Cie was in the summer of 1955, when he met in Paris with Pierre Naude, who was then the chief executive officer of the Paris company. The two discussed the 1919 agreement with respect to closer cooperation between the two firms. Cerruti engaged a French firm of "counsellors in industrial property" to negotiate with Naude a mutual cooperation agreement to clarify and redefine the terms of the 1919 agreement but these negotiations came to naught. Naude's notes on the negotiations indicate that he was of the view that under the 1919 agreement the American firm had been granted the exclusive right to use the Charvet mark but only if all the terms of the agreement were adhered to by defendant, including that it purchase goods from the Paris firm and represent the Paris firm in the United States. Naude was aware that the French firm's claim of its right to the mark in the United States was challenged. Thus, in May 1955, he received a letter from an American retailer, Maurice L. Rothschild & Company, which stated: "I have gone into the matter of selling your ties in America and I think the expert with whom I spoke felt that New York Charvet has exclusive rights to the name and it would be a serious mistake to involve ourselves in the matter."

The next key event occurred in 1965, when Denis Colban, a French citizen, acquired the controlling stock of the French firm and succeeded Naude as its chief executive officer. It is undisputed that when he took over the Paris house Colban knew of the New York firm's existence, the 1919 contract, the federal registrations of the mark, and the negotiations and controversies between the two firms over the years. Cerruti and Colban met in Paris shortly after Colban became the principal of the Paris firm. The two tried again, as others had in the past, to negotiate definitive terms of the relationship between the two firms, but once again nothing came of it. Thereafter they met almost annually either in New York or Paris. During their initial and subsequent yearly meetings Cerruti consistently maintained that defendant owned the exclusive right to the mark in America, and Colban consistently contended that the plaintiff was the owner. Strange as it may seem, these discussions were carried on intermittently for more than thirteen years but without result. They continued until 1979, and throughout it is clear that the parties took diametrically opposite positions as to which company owned the mark in America.

During the years of their unresolved controversy, Cerruti sought to enforce his registrations. A key incident occurred in 1971, when Cerruti became aware that Bloomingdale's was selling shirts and neckwear labelled Charvet which had been shipped by the Paris firm to Bloomingdale's. The defendant's attorney wrote to Bloomingdale's charging "flagrant infringement" of defendant's registered trademarks. Bloomingdale's forwarded the attorney's letter to the Paris firm and proposed that it dispose of the infringement claim and agree to indemnify Bloomingdale's against any liability from the sale of the goods. The Paris firm did not sign a submitted proposed agreement; instead, it accepted the return of the alleged infringing items from Bloomingdale's, but it took no legal action against the defendant.

Two more such incidents occurred. In December 1977 Cerruti learned that Bergdorf Goodman was selling Paris Charvet men's shirts and women's apparel and had a "Charvet" boutique in its store. The defendant's attorney wrote to Bergdorf again asserting a claim of trademark infringement based upon the registrations and the use of the mark for "almost half a century . . . throughout the United States." Bergdorf's attorney informed Colban of the matter by phone and letter, advising him that the defendant had recorded its registrations

with Customs and that the way to contest defendant's claim was to bring an action against Customs or an action to cancel defendant's registrations. The Bergdorf attorney even recommended a French trademark attorney for plaintiff to consult. Still plaintiff took no action, and Bergdorf entered into a settlement agreement with defendant under which Bergdorf agreed to notify the French firm that its "use of the Charvet mark in the United States will continue to result in claims of infringement and should be avoided on all merchandise to be shipped to the U.S.A." Another Bergdorf incident occurred in the fall of 1981 when Cerruti learned that Bergdorf was again selling Paris Charvet shirts and other items. Its attorney wrote the store, and Bergdorf agreed to discontinue sale of the items. By this time plaintiff, a few months earlier, in June 1981, filed a cancellation petition in the United States Patent and Trademark Office. However, the petition was dismissed with leave to replead, which plaintiff did not do since it had already commenced the instant suit on October 5, 1981.

While plaintiff took no legal action until the cancellation proceeding and then the commencement of this suit, it did consult attorneys in the mid-1970's. In 1976, Irving Schneider, an American attorney who was a customer of the Paris store, was asked by Colban to help with the matter. Schneider thought the solution was for the French company to form domestic corporations under the name Charvet, but this was ineffective because of outstanding corporations bearing the name. At or about this same period, Colban also engaged the Paris office of Coudert Brothers to investigate the matter in the United States. The firm conducted a trademark search on plaintiff's behalf and it must be assumed they advised plaintiff of the defendant's registrations disclosed by the search.

The foregoing recital of events compels a finding that whatever the merits of plaintiff's claim that it is the sole and exclusive owner of the trademark in the United States it is barred by its laches from asserting that claim with respect to goods on which the defendant still uses the mark. The trial record overwhelmingly establishes that despite the fact that Dominique France, the present claimant, and its predecessors, in one form or another over the many years asserted the right to the exclusive use of the mark, not only Colban, from the time when he acquired his interest in the Paris firm in 1965, but his predecessors stood by and took no affirmative action to challenge or halt the defendant or its predecessors from use of the mark until the commencement of this action in October 1981.

To sustain its burden of proof on its defense of laches, the defendant

> must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time.[5]

The French firm knew of Woone's use of the mark as far back as the 1920's. Since plaintiff's claim to the mark derives through the original firm, it is charged with that firm's knowledge. Looking to the more recent period, during the 1950's and early 1960's, Naude of the French firm knew of the defendant's use of the mark and its registrations. Indeed, as already noted, an American retailer refused to sell the French firm's ties in America due to defendant's claim of exclusive ownership and so notified Naude to this effect. Yet Naude took no action to contest defendant's rights. And then, looking to the time when Colban acquired his interest in the French firm and became its chief executive officer, he knew of the American firm's repeated claims to the exclusive right to the mark and of its registrations. Indeed, on two

---

5. *Cuban Cigar Brands N.V. v. Upmann Int., Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978), aff'd, 607 F.2d 995 (2d Cir.1979). *See also University of Pittsburgh v. Champion Products, Inc.,* 686 F.2d 1040, 1044 (3d Cir.1982); *Saratoga Vichy Spring Co., v. Lehman,* 625 F.2d 1037, 1040 (2d Cir.1980).

occasions, New York stores were prevented from selling plaintiff's goods, and he took no action against the defendant. The proof of knowledge and inaction from an extended period is overwhelming and incontrovertible.

Nor can plaintiff's delay be excused. Plaintiff's argument that it was engaged in ongoing negotiations with defendant which it hoped would resolve the matter is feeble and unpersuasive—by Colban's own testimony, he and Cerruti consistently took diametrically opposed positions during their failed discussions. It is one thing to make allowance for delay due to bona fide efforts to resolve a controversy.[6] But it is fatuous to suggest that year in and year out desultory conversations, some occurring during chance meetings, which achieve no result and with each party adhering to its position, excuses delay. Plaintiff's utter indifference to its claimed right is emphasized by the fact that it had the advice of two separate attorneys as far back as 1976 and yet it took no affirmative action to halt defendant from its use of the mark until five years later when it filed this action.

Plaintiff also attempts to excuse its delay by arguing that it believed the New York firm was acting as its agent and thus there was no need to contest its right to the name—an incredible contention in light of the facts that defendant was preventing the sale of the French firm's goods and did not sell the French firm's merchandise.

Despite plaintiff's argument to the contrary, defendant has been prejudiced in some respects, but not entirely, by plaintiff's inexcusable delay. Thus it has made it difficult for defendant, no less than for plaintiff, to prove its contentions as to some matters, not to mention the problems faced by the Court in attempting to determine the intentions of persons long dead.[7] The terms of the 1919 contract almost from the time it was signed were the subject of controversy, among other matters as to whether the interest granted to Woone was an outright assignment or a mere license. Nor is much evidence available as to the actions of the original parties after the formation of the contract as a guide to its interpretation.[8] Instead, the Court is left with the argumentative contentions of Cerruti and Colban, neither of them participants to that agreement or immediate subsequent events but rather latecomers on the scene, each interpreting the meager evidence that is available to his own advantage. There has been a loss of evidence not only in terms of the deaths of key witnesses but in the loss of some of the defendant's records were destroyed by a flood in its warehouse.

Apart from the problem of proof by reason of delay, the defendant has been prejudiced in another respect. Thus, had the plaintiff aggressively asserted or taken action to enforce its claimed right to the mark in the United States, when Woone took a counter position, clearly it would have cast a cloud on the title to the mark, in which circumstance the defendant probably would not have purchased the Charvet firm from the Woone estate until the matter was resolved.[9] In sum, there is sufficient prejudice resulting from plaintiff's inexcusable delay so that plaintiff is barred from assert-

**6.** *Cf. Mogavero v. McLucas,* 543 F.2d 1081, 1083 (4th Cir.1976); *Kinark Corp. v. Camelot, Inc.,* 548 F.Supp. 429, 438 (D.N.J.1982); *Olympia Werke Aktiengesellschaft v. General Electric Co.,* 545 F.Supp. 598, 614 (W.D.Va.1982).

**7.** *See Russell v. Todd,* 309 U.S. 280, 287, 60 S.Ct. 527, 531, 84 L.Ed. 754 (1940) ("In the application of the doctrine of laches it [is] recognized that prejudice may arise from delay alone, so prolonged that in the normal course of events evidence is lost or obscured."); *Hill v. W. Bruns & Co.,* 498 F.2d 565, 568 (2d Cir. 1974) ("Laches is a doctrine aimed at avoiding the commencement of stale claims in equity where it is impossible or difficult for a defendant to defend because evidence has been destroyed or lost as a result of the delay in the institution of the action."). *Cf. Davis v. Musler,* 713 F.2d 907, 916, No. 82–7412, slip op. at 5254 (2d Cir. July 18, 1983).

**8.** With the exception of Woone's statements when in 1945 he applied to register the mark and the series of letters between the two firms dating from 1919 to 1932.

**9.** *Cf. Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1042 (2d Cir.1980).

ing its claims at this late date except as to the following matter.

Plaintiff contends that despite the delay defendant has not been and will not be prejudiced if plaintiff is permitted to assert its right to the mark, since not only has the defendant's Charvet business diminished over the years [10] but the nature of its business has changed substantially—it is now primarily a wholesale tie business rather than a retail shirt and haberdashery business and has abandoned the use of the mark on other products.

Based upon a word by word reading of the entire trial transcript, the trial exhibits, the Court's contemporary trial notes and its appraisal of the demeanor and credibility of the witnesses, the Court finds that the nature of defendant's Charvet business has changed materially—that it is now conducting and since at least 1979, if not earlier, has conducted a wholesale tie business rather than the retail shirt and haberdashery business as in former years. There is no doubt that the volume of defendant's Charvet business has dwindled substantially. But whatever its reduced volume, it still uses the mark, although only on ties for wholesale or commercial sales. The defendant, following its acquisition of Charvet et Fils, Inc., when it was located on East 53rd Street, New York City, as a retail store for the sale of fine custom shirts, moved several times to other store locations in the area where it consolidated its retail sales activities with those of Dominique France, Inc. In 1979 the retail store operations were given up entirely and defendant since then has conducted its business from the fifth floor of an office building on Madison Avenue, New York City. Here the nature of its sales is radically different from the retail direct store sales previously conducted, which under the 1919 contract was to "do a general business similar to that of the French firm." Today and at least since early 1979, the defendant's business is that of a tie wholesaler who sells to commercial stores who at times require their own private label and at other times accept defendant's other trademark, Cerruti CXIII. During this period the use of the Charvet mark has been severely limited and applied, if at all, only to ties. The defendant has ceased the use of the mark on men's and women's shirts and other accessories.

Plaintiff has carried its burden of proof and has abundantly established its claim that the defendant abandoned the Charvet mark on all goods, other than ties, early in 1979 and for some time prior thereto, and since then the mark has not been used in commerce on such items. Under the statute, "nonuse for two consecutive years shall be prima facie abandonment." [11] Defendant failed to overcome plaintiff's substantial proof of non-use or to rebut the statutory presumption. The flood in May 1981 at defendant's warehouse in New Jersey, may explain its inability to meet some of plaintiff's contentions with respect to matters antecedent thereto. However, assuming the loss of its records, the defendant has failed to come forward with the slightest credible evidence, testimonial or documentary, to counter plaintiff's evidence of nonuse or abandonment during the period plaintiff charged that the nature of defendant's operation changed from a retail store to a wholesale distributor of ties to commercial enterprises. The trial occurred more than a year and a half after the flood. Surely documents of transactions were in effect after that date and maintained at its current premises in this city. Defendant failed to produce a single document showing a sale of the Charvet mark on products other than ties. The contention that it was too expensive or too difficult to maintain

10. See, e.g., Dwinell-Wright Co. v. White House Milk Co., 132 F.2d 822, 825 (2d Cir.1943) (L. Hand, J.) (Prejudice found because defendant's business had grown "like a mustard tree" during the years of delay). See also Cuban Cigar Brands N.V. v. Upmann Int., Inc., 457 F.Supp. 1090, 1098 (S.D.N.Y.1978), aff'd, 607 F.2d 995 (2d Cir.1979) ("[D]efense of laches requires more by way of showing prejudice than the simple fact that business continued during the period of delay.")

11. 15 U.S.C. § 1127(a).

records does not ring true.[12] It failed to call a single purchaser from the metropolitan area where most of its sales are made. It failed to offer the deposition testimony of any witness beyond the subpoena power of the Court.

The defendant's enforcement activities prior to 1979 do not establish lack of intent to abandon the mark thereafter when it changed the nature of its business and applied the mark only to ties and did not use it on other products which it no longer sold. There is substance to plaintiff's claim that defendant's continued assertions after 1978 that it still retained the right to the mark even on those products it no longer sold essentially was a tool to support its litigation against plaintiff. Self-serving statements that one is the owner of a trademark are not use of the mark in commerce. Facts, not statements, govern. Intent to abandon is determined by all the facts and circumstances.[13] Here the evidence of abandonment is abundantly established by the nonuse of the mark at least since early 1979. Further, since plaintiff proved that it shipped shirts and related items bearing the mark into this country since the time of defendant's abandonment, it has established its right to the mark for use on products other than ties.[14]

## CONCLUSION

Plaintiff's activities in the United States through the years have been of two types. One, the sale and distribution of its products under the trademark to commercial purchasers such as well known department stores and prestigious haberdashery shops. The other, the sale of its products to individual customers either at the Paris store, following which the goods are shipped to the customer at a designated address in the United States or delivered to a vessel or airline enroute to the United States, or the receipt at the Paris store by air mail, telephone or telex orders from individual customers in the United States, which are then filled and shipped into the United States. Since the record is clear that whatever the claims of the parties through the many years this was a continuing and accepted arrangement, the decree to be entered shall expressly provide that plaintiff is free to continue to use its mark as in the past on all merchandise shipped into the United States in response to orders by individuals.

Also, since the defendant at least since early 1979 has discontinued with intent not to resume the use of the Charvet mark on all products except on men's and women's ties, the decree shall provide that plaintiff has the right to use the Charvet mark in commercial sales of its merchandise in the United States except on men's and women's ties and the defendant is enjoined from using the Charvet mark except on men's and women's ties. Each party shall indicate through its labelling on its products and advertising that it is not connected with the other.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Submit decree in accordance with the foregoing.

---

**12.** Defendant's Post Trial Brief at 34; Tr. at 687–88.

**13.** 15 U.S.C. § 1127(a). *See also Baglin v. Cusenier Co.,* 221 U.S. 580, 598, 31 S.Ct. 669, 674, 55 L.Ed. 863 (1911); *Oklahoma Beverage Co. v. Dr. Pepper Love Bottling Co.,* 565 F.2d 629, 632 (10th Cir.1977); *American Photographic Publishing Co. v. Ziff Davis Publishing Co.,* 135 F.2d 569, 573 (7th Cir.1943); *Kirkland v. National Broadcasting Co.,* 425 F.Supp. 1111, 1118 (E.D.Pa.1976), *aff'd,* 565 F.2d 152 (3d Cir.1977).

**14.** *See La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1274 n. 11 (2d Cir.1974) (Friendly, J.) (Balance of equities plays an' important role in deciding whether use of a mark warrants trademark protection); *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 534 (2d Cir. 1964).