**CERRUTI 1881 S.A., Lanificio Fratelli Cerruti S.p.A. and Antonio Cerruti, Plaintiffs,**

v.

**CERRUTI, INCORPORATED, Leo E. Cerruti, and Leo Cerruti Design Studio CXIII, Defendants.**

**No. 95 Civ. 7782 (MBM).**

United States District Court, S.D. New York.

Dec. 19, 1996.

574

Carol Witschel, White & Case, New York City, for Plaintiffs.

Andrew Baum, Darby & Darby, New York City, for Defendants.

## AMENDED OPINION AND ORDER

### MUKASEY, District Judge.

The parties compete in the licensing and distribution of goods, principally clothing and accessories, featuring the name Cerruti. Plaintiffs have sued for a declaration that agreements between the parties have terminated, and that three of defendants' trademarks that include the name Cerruti have been abandoned and therefore must be cancelled. Defendants have counterclaimed for breach of the subject agreements, and for trademark infringement and false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

The case is now before the court on plaintiffs' motion to strike defendants' answer and counterclaims, to enter judgment for plaintiffs on the merits, and to award plaintiffs their costs and fees. To justify that stark result, plaintiffs assert that defendants have tried to establish their factual position in this lawsuit principally if not entirely on the basis of fabricated documents and the false testimony of Leo E.Q. Cerruti. Plaintiffs rely on the court's inherent power to grant the relief they request so as to avoid a fraud on the court's processes.

As set forth below, the evidence presented both by affidavit accompanied by an Appendix of Exhibits, and at hearings on July 10 and October 11, 1996, overwhelmingly establishes that defendants, through their principal Leo E.Q. Cerruti, fabricated invoices to establish that the subject agreements remained in force and that the trademarks had not been abandoned, and that he repeatedly lied under oath in an effort to (i) conceal such fabrication once it became apparent, (ii) establish other facts helpful to his position, and (iii) account for defendants' repeated failure to produce or locate documents and other evidence, or to call witnesses. Although the relief plaintiffs request here is rarely granted, because defendants' misconduct was pervasive and directly concerned the merits of the case, and subject to the limitations set forth below, the motion is granted.

## I.

### A. The Parties and the Pleadings

Plaintiff corporations, Cerruti 1881 S.A. and Lanificio Fratelli Cerruti S.p.A., are organized under the laws of France and Italy, respectively; plaintiff Antonio Cerruti is a fashion designer and president of the French corporation. (Compl. ¶¶ 1–3) (collectively, "Cerruti 1881") Defendant Cerruti Incorporated was a New Jersey corporation succeeded in interest by two other New Jersey entities, defendant Cerruti Design Studio CXIII and counterclaimant Cerruti Limited, Incorporated. (First Amended Answer and Counterclaims ¶¶ Answer 2, 3; Counterclaims 1, 2) Defendant Leo E.Q. Cerruti apparently is an officer of both.

In 1974, Cerruti 1881 entered into an agreement (the "1974 agreement") with defendants to resolve disputes relating to use in the United States of trademarks including the word "Cerruti." Broadly, the 1974 agreement provided that the parties would desist from using "Cerruti" as part of a trademark except as follows: Cerruti 1881 would use it only as Cerruti 1881 or Antonio (or Nino) Cerruti, and defendants would use it only as Cerruti CXIII or Leo Cerruti. (Compl. Ex. A ¶ 1) Further, each party agreed to give up use of certain other Cerruti trademarks, with the result that the parties

would not compete under the Cerruti name in marketing some products, but would compete under that name in marketing other products. (*Id.* ¶¶ 2–5) In 1988, the parties entered into another agreement, as of August 1, 1988 (the "1988 agreement") permitting Cerruti 1881 to distribute men's ties in the United States under a trademark that included the name "Cerruti." (Compl. Ex. B) The parties agree that the 1988 agreement has expired by its terms, although defendants argue that its requirements to report sales and pay royalties survive and that Cerruti 1881 has breached them. (Counterclaims ¶¶ 15–20)

By letter dated July 25, 1995, Cerruti 1881 notified defendants that the 1974 agreement was terminated upon the ground, among others, that defendants had not used any trademark incorporating the name "Cerruti" on or in connection with goods for the preceding two years, and therefore had abandoned such trademarks. By letter dated August 7, 1995, defendants disputed, among other things, abandonment of the marks and termination of the 1974 agreement. (Compl. ¶¶ 17, 18; Answer ¶ 11) Plaintiff initiated this action in September 1995.

Defendants have three trademarks incorporating the name "Cerruti" that are at issue in this case. (Compl. ¶ 13; Answer ¶ 7) Because the end and aim of the 1974 and 1988 agreements was to allocate and protect the parties' rights to trademarks that include the word "Cerruti," the continued existence of those trademarks is central to this case. In particular, if defendants are found to have abandoned those trademarks, their rights under the 1974 agreement would vanish. *See Topps Chewing Gum, Inc. v. Imperial Toy Corp.*, 686 F.Supp. 402, 408 (E.D.N.Y.1988) ("[T]he only frustrating event which could have destroyed the value of the contract would have been a final and binding decision that Topps did not hold valid title to the GPK copyright and trademark, thereby preventing any use whatsoever by Topps of the GPK."), *aff'd*, 895 F.2d 1410 (2d Cir.1989); *cf., Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*,

874 F.2d 95, 102–03 (2d Cir.1989) (holding that there was no frustration of purpose even if transferred mark was generic because contract was simply distribution arrangement).

Defendants were aware from prior litigation of the importance of being able to prove use of a mark in order to prevent a finding that the mark has been abandoned. In *Charvet S.A. v. Dominique France, Inc.*, 568 F.Supp. 470, 476–77 (S.D.N.Y.1983) (Weinfeld, J.), *aff'd*, 736 F.2d 846 (2d Cir.1984), defendants' corporate affiliate was held to have abandoned a trademark as to certain goods when it could not prove use. Notably, Judge Weinfeld's opinion includes the following:

> Defendant failed to produce a single document showing a sale of the Charvet mark on products other than ties. The contention that it was too expensive or too difficult to maintain records does not ring true.

568 F.Supp at 476–77. The defendant in that case also accounted for its inability to produce evidence by claiming that witnesses had died and that records had been destroyed in a flood at its warehouse. *Id.* at 475.

### B. *Discovery*

As noted, this action was filed in September 1995. In November 1995 defendants' counsel—who, as will be reiterated at the end of this opinion, is utterly blameless with respect to defendants' transgressions described herein—wrote to plaintiffs' counsel, offering "documents concerning our client's use during the last few years," which he had received from his client and suggested would be "dispositive on the abandonment issue." The documents in question were said to be "hard-copy prints of sales records kept on computer disk." (P–App.[1], Ex. G) Three categories of sales eventually were said to be reflected in such records: mail order, retail store and warehouse. However, discrepancies relating to those records emerged during discovery. Defendants' principal, Leo E.Q. Cerruti, later would attribute such discrepancies to a computer disk error, as follows:

---

**1.** "P–App." refers to plaintiffs' Appendix of Exhibits submitted in connection with the sanctions motion.

The facts are that all our sales records (retail, mail order, and factory closeout) had been placed onto removable Syquest hard disks for storage purposes. The records were removed from our main computer storage due to lack of disk space. It appears that when the records were read from the storage disks, for the purpose of supplying sales records for this action, the records did not properly reestablish themselves in their original condition.

(Cerruti 3/19/96 Decl. ¶ 8) As set forth below, defendants' counsel conceded in February 1996 either that the records themselves were unreliable or that the corroboration one would normally expect to find for the contents of such records could not be located. (P–App. Ex. A)

The mail order sales records (P–App., Ex. B) purported to reflect transactions from 1985 through 1995, but the dates of certain transactions antedated the existence of the corporate entity alleged to have consummated the sale (Witschel Aff. ¶ 21A), and other transactions testified to by Leo E.Q. Cerruti at his deposition are not reflected in records for the corresponding dates, either because particular items do not appear or because prices do not correspond with items allegedly sold. (Id. ¶¶ 21B, C) In each instance, Cerruti fell back on computer error to account for a discrepancy in date, item or amount. (Cerruti 3/19/96 Decl. ¶¶ 21A, B) The mail order sales slips for 1995, the most recent such records produced and therefore the ones that would most easily lend themselves to verification by contacting the customers whose names and addresses appear thereon, carry only random numbers in the fields where the customers' names and addresses should appear. (P–App., Ex. B at D 048–D 065) Here again, Cerruti claimed the numbers in these fields resulted from a disk error. (Cerruti Dep. 153–55, 302, 306–07) Plaintiffs' counsel detailed the unsuccessful efforts she made to verify mail order purchases listed in the 1985–1995 records. (Witschel Aff. ¶¶ 22–24) In any event, defendants have not submitted any affidavit or other direct proof from anyone who allegedly purchased Cerruti-marked goods by mail from 1985 through 1995.

To the extent defendants sought to substantiate the withdrawn mail order records with invoices and purchase orders for goods (P–App., Ex. N, O)—which records were not computer-generated and thus could not contain errors attributable to a disk malfunction—those records too proved faulty upon examination by plaintiffs' counsel. Some of the documents themselves appear to have been altered by removing portions of them; others reflect totals of goods that do not correspond to totals of goods claimed by Leo E.Q. Cerruti to have been sold. (Witschel Aff. ¶¶ 55–56, 46–54) Although Cerruti continued to deny that he had altered any documents, insisting for example that the missing portions were tear-off stubs sent to the warehouse (Cerruti 3/19/96 Decl. ¶ 48), and continued to contend that the totals on other documents were expressed in dozens and not single units (Id. ¶ 55), defendants disclaimed reliance on these documents as well (P–App., Ex. A), notwithstanding that Cerruti would later disavow that disclaimer. (Cerruti 3/19/96 Decl. ¶ 42)

All of the purported mail order sales records reflect payment by credit card, whether Visa, Diners Club or American Express. (P–App., Ex. B) One convenient way to substantiate mail order sales would have been to produce records of or from those credit card companies reflecting payment to defendants. Plaintiffs' counsel served a subpoena on American Express, which had no record of any of defendants' companies. (Witschel Aff. ¶ 27; P–App., Ex. P, Q) Cerruti accounted for the absence of such records as follows:

> All credit card sales accounts are under the name Dominique France, Inc. These accounts were handled by our bookkeeper, Lillian Wachsler. Mrs. Wachsler has passed away and I cannot find the proper records. They were kept in her files which were transferred to our New Jersey location. I have torn the place apart looking for them but to no avail. It seems that we have a serious problem proving everything we are saying but sometimes truth is very much stranger than fiction.

(Cerruti 3/19/96 Decl. ¶¶ 27, 28, 29)

The records defendants produced relating to retail store sales purport to record trans-

actions between January 1988 and July 1992 at 545 Madison Avenue. (P–App., Ex. C) Plaintiffs have proffered a document reflecting that by July 20, 1988, defendants were receiving mail at 123 East 54th Street, and the deposition testimony of Leo E. Cerruti, father of Leo E.Q. Cerruti, that defendants did not operate at 545 Madison Avenue and at 123 East 54th Street at the same time. (P–App., Ex. S) Thus, purported retail sales between July 1988 and July 1992 are suspect for allegedly having taken place at a location defendants did not occupy. Moreover, many sales that allegedly reflect credit card sales nonetheless do not reflect the name of the purchaser. (*E.g.,* D 385)

Leo E.Q. Cerruti simply insisted that his father had been "mistaken" when he testified that defendants did not occupy the two premises at the same time, and claimed that they did so "maybe 2 years or a bit more, I am not exactly sure." (Cerruti 3/19/96 Decl. ¶ 31) Even if his unsworn declaration were believed, that would still mean that defendants had produced two years worth of fraudulent records, because two years from 1988 is 1990, and defendants' records purport to reflect transactions as late as 1992. In any event, defendants have not come forward with any credit card records to substantiate the alleged retail store sales, nor have they produced a lease or other records to substantiate that they occupied the Madison Avenue location on the dates of such sales.

The records purporting to reflect warehouse sales of ties in 1994 and 1995 (P–App., Ex. D) are no more convincing. As defense counsel noted, these records were produced in two groups, the first recording 414 separate sales, none of which record sales of one or two ties and 105 of which record sales of 10, 11 of 12 ties at a time. Thereafter, defendants produced a second batch of records purporting to include some sales of one or two ties. Further, defendants have been unable to produce any record of the names, addresses or telephone numbers of the temporary employees Cerruti claims worked at these warehouse sales. (P–App., Ex. A) Cerruti's testimony with respect to this gap in his records is flawed as well. As noted, the sales took place in 1994 and 1995. Cerruti asserts in his declaration that temporary employees were hired "off the books" and "paid in cash," and "[m]ostly they were hired to help Deborah Mincey." (Cerruti 3/19/96 Decl. ¶ 40) However, Cerruti testified at his deposition that Mincey last worked for his company in 1990. (Cerruti Tr. 108)

Finally as to the 1994 and 1995 warehouse sales, Cerruti has given conflicting accounts of his inability to produce original records to back up the sales. Although Cerruti purported to describe at his deposition the appearance of the original hand-written records from which the produced records allegedly were generated, when the anomaly of not having records even for sales after the date of the commencement of this litigation was pointed out to him, he changed his story and claimed that there had never been hand-written records. Thus, he testified as follows at his deposition:

Q. Does Cerruti Limited have blank invoices that are originals?

A. That look like this?

Q. Yes.

A. No, it is a different form. What we use in our warehouse is strictly something you would buy in the stationery store. There are two boxes. One says 'Cerruti,' one says 'Dominique France.' When someone buys the ties, they would go in a Dominique France or Cerruti box. When we entered into the computer, if the customer wanted a receipt, he would get this. Otherwise, it would be entered in the computer in the same manner, separately under Cerruti and Dominique France.

Q. So is it correct that Cerruti Limited has no originals of the documents that are set forth in Plaintiffs' Exhibit 12 [corresponding to P–App., Ex. D]?

A. No, we don't keep them.

Q. How long after you enter the information into the computer do you throw them away?

A. Right away. They may be kept around. Whoever entered them into the computer may have kept them for a day or two, but typically, unless there is a problem, they would be thrown away right away.

(Cerruti Tr. 121–23) The portion of Cerruti's declaration dealing with warehouse sales records, in response to the current motion, reads as follows:

> Sales slips were never generated, information was entered directly into a small portable computer at the time and the disks were brought back to our New York office where the information was then entered into the computer. I do not recall stating that we destroyed any sales slips as there were none to destroy. As a matter of fact I recall plaintiff's counsel asking me what we did if someone wanted a receipt and I answered that we then made one out for them but I'm sure that was quite a rare request.

(Cerruti 3/19/96 Decl. ¶ 38)

In addition to purported sales records allegedly showing that defendants sold goods bearing the subject marks, defendants sought to rely on correspondence reflecting attempted licensing of the marks to counter claims of abandonment. They produced a document purporting to be a file copy of a letter dated June 6, 1995 to a Los Angeles company confirming a conversation with Leo E.Q. Cerruti about licensing the Cerruti mark. (P–App., Ex. T) The date of the letter was more than a month before Cerruti 1881's July 25, 1995 letter notifying defendants that the 1974 agreement had lapsed due to abandonment of the marks. However, the addressee of the letter, Mervyn Mandelbaum, testified that he never received it, and had not discussed any license with Cerruti until August 1995—*after* plaintiffs' July 25, 1995 letter. (P–App., Ex. U (Mandelbaum Tr.) at 20–21)

When plaintiffs' counsel asked Cerruti in January 1996 to identify employees who had worked for defendants in New York for the last five years, he identified one such employee as Lillian Wachsler, who had served as bookkeeper but who "passed away last year." (Cerruti Tr. 109) Later in the deposition, when the questioning turned to the subject of who kept records relating to credit card transactions, Cerruti identified Wachsler as the employee who had last kept such records, and again said she had died in 1995, in September or October. (*Id.* at 315–17) In his unsworn declaration in opposition to this motion, Cerruti again reiterated that his bookkeeper, Wachsler, had died "well after the last collection [from credit card companies]. She retired after we did not need her on a permanent basis anymore and she died shortly thereafter, in November or December of 1995." (Cerruti 3/19/96 Decl. ¶ 57J)

Cerruti testified at his deposition in January 1996 that the company used an accountant named Ken Gould to prepare its tax returns and accounting documents, that he came to defendants' office twice a year, and that he had last come to defendants' office "several months ago." (P–App., Ex. E p. 325) Gould testified at his deposition that he had not performed accounting services for defendants for about ten years. (Gould Tr. 23) Defendants have conceded that they cannot provide any corroboration that Gould was used as an accountant during any period relevant to this litigation. (P–App. Ex. A)

Gould's deposition testimony also tended to contradict Cerruti's claim that Lillian Wachsler had died in the fall of 1995. The accountant testified that about five years ago he had heard that Wachsler had died. (Gould Tr. 27, 28) Although such testimony certainly cannot be received for its truth, Fed.R.Evid. 802, it does raise the question of how Gould could have heard of Wachsler's death four or five years before it happened. That question would be answered more definitively at a hearing on July 10, 1996.

## C. *The July 10, 1996 Hearing*

Cerruti was the only witness at a hearing on July 10, 1996. He testified further about the curious computer records defendants produced, why defendants had not produced tax returns, ledgers, journals, leases, or indeed any records to support the claim that they used the disputed marks other than the computer records, and why no witnesses could be located who could provide corroborative testimony.

Cerruti explained the presence of random numbers in his mail order sales records, and other such irregularities, by blaming a computer disk error. He testified that the computer had put random numbers where the names and addresses of some customers

should have been, and had moved names and addresses between and among sales slips so that although the number of sales and the names were accurate, nothing could be checked. (*E.g.,* 7/10/96 Tr. 21–26)

As noted above, defense counsel had disclaimed any reliance on the records defendants produced with respect to warehouse sales (P–App., Ex. A), but Cerruti himself had disavowed that disclaimer, asserting that it had been made without his authorization. (Cerruti 3/19/96 Decl. ¶ 42) However, Cerruti received a copy of the letter containing the disclaimer, and presumably was aware that he had not authorized it. His testimony on this subject is set forth fully below, the better for the reader to judge his candor:

Q. If I could direct your attention to Exhibit A.

A. A.

Q. A letter from your counsel to me dated February 16.

A. Yes.

Q. Specifically item No. 2 in the letter indicates that the closeout cash receipts at the Cerruti warehouse are not accurate or reliable?

A. And I don't agree with that. I never said they were. I believe—I'm sorry, but I believe that was a mistake by our attorneys. I never said they were inaccurate. To my knowledge, they are accurate. The warehouse sales cash receipts records are accurate, to the best of my knowledge, they were accurate. I see no reason to suspect them.

Q. You didn't see any reason to suspect that any of the 1985 to 1994 mail order sales records were corrupted either?

A. Excuse me. I see no reason *now to* suspect them. I do suspect the other ones. At the time, I didn't suspect anything. I also suspect that as I testified just a few moments ago, I suspect that there's a very strong possibility that the records are corrupted for the 545 Madison retail store sales and they cannot be relied upon based on the fact of the other things, but in this situation with these—with that New Jersey location, I don't think they're corrupted. I think they're fine.

Q. Is it your testimony that your counsel was not authorized by you to tell us those records were unreliable?

A. That's right, for that specific one.

THE COURT: Mr. Cerruti, that Exhibit A—

THE WITNESS: Yes—

THE COURT:—reflects that you received a carbon copy?

THE WITNESS: Yes.

THE COURT: I take it that when you discovered that records were mistaken, that was a matter of some importance to you; was it?

THE WITNESS: Yes, Yes.

THE COURT: And your counsel notified opposing counsel of those inaccuracies was a matter of importance to you?

THE WITNESS: Yes.

THE COURT: When you got a copy of this letter, did you read it?

THE WITNESS: Yes, I did. And we had a telephone discussion about it. The trouble is, I don't remember the exact details of the conversation, but we did discuss it.

THE COURT: And you discovered that the letter was inaccurate insofar as it reported that the closeout cash sales were inaccurate, that those records were inaccurate?

THE WITNESS: That's right, because I didn't see this letter before it was mailed out.

THE COURT: But you saw it after it was mailed out?

THE WITNESS: Afterwards.

THE COURT: And you then found out it was erroneous; correct?

THE WITNESS: That's correct.

MR. BAUM: Your Honor, I object to the characterization as "erroneous."

THE WITNESS: As whatever, I'm just saying it was not.

MR. BAUM: It was a letter from me as counsel informing the attorney on the other side that I would not rely on those records.

THE COURT: Mr. Cerruti, did you seek to have any letter sent to correct the sug-

gestion that there was anything wrong with the closeout cash sales records?

THE WITNESS: To be honest, I don't remember our conversation, but I seem to think—I seem to remember that this was the best course that we should take and, therefore, I don't think I objected any further. I'm not sure—O.K. I didn't make sense?

I'm just saying, in discussing with our attorneys, and I said, look, there's something wrong here, I don't believe that these should be left out because I believe them to be accurate, I seem to remember during the course of the conversation that I was advised by our attorneys—

MR. BAUM: Your Honor, if the witness wishes to waive the privilege with respect to this conversation, that's his option. I would ask just for clarification that this not be construed as a complete waiver of the attorney-client privilege. I don't think it's our intention to do that.

THE COURT: Understood. I didn't ask him for the substance of the conversation. He's volunteering it.

MR. BAUM: I understand. And I would like to advise my client that there is a privilege. If you want to waive it, that's your choice, but you are not obligated to reveal the substance of your conversation with me.

THE WITNESS: I understand. And I understand that there is the attorney-client privilege, but at the same time, I would like to make it clear that my personal opinion was not those records were accurate and, however, in our discussions with our attorneys, while I understand there's attorney-client privilege, it was thought that it was better to leave it [out] completely, just in case later on there was a problem. We never pursued it much after, I never pursued it beyond that.

THE COURT: So, your testimony is you told your lawyer you think those records are, in fact, accurate, and your lawyer told you, no, let's say they're inaccurate, in case we find out they're inaccurate later, in substance.

THE WITNESS: I don't think I said that specifically, but I think that was maybe my

suspicion or fear that that might happen. So, he had said, look, it's better just to leave them out and forget about it, because it's not—that they may or may not be accurate. He didn't think they were accurate.

THE COURT: Do you know what the source was of his information other than you?

THE WITNESS: No, no.

THE COURT: Or, in fact, he had no source of information other than you; did he?

THE WITNESS: I don't know. I don't think so.

(7/10/96 Tr. 86–91) This lengthy excerpt captures not only Cerruti's testimony about one narrow subject, but also the madcap, improvisational quality of his testimony in general. Often, he just made it up as he went along.

Cerutti accounted for missing records with the assertion that all of the defendants' ledgers, journals, tax returns and other papers records had been contained in a three-drawer filing cabinet in the bookkeeper's area of the office, that during his absence on a business trip his father had shipped the cabinet to a warehouse in New Jersey, and that the cabinet could not be located:

I couldn't find the cabinet. There's a reason why. My father had moved the cabinet with all the furniture from that area in order to clear the work space for himself while I was away on a business trip. He took everything with him supposedly to a warehouse in New Jersey and I cannot find this cabinet anyplace. It's got to be there. I've been looking through. I've been tearing the place apart. I haven't even found the desk that the bookkeeper worked on.

(7/10/96 Tr. 6) He then added:

My father is 91 years old. I don't know what he did with it. We're in a terrible situation. I had to ask for an extension on our taxes for '95 because I can't find the information for '95 to prepare our taxes.

(Id.) Here it bears mention that when he tried to explain in his unsworn declaration why he had erred as to the identity of the

accountant who prepared the defendants' tax returns and financial statements, he maintained that "[m]y father is in charge of this and I never knew that he was no longer using Ken Gould." (Cerruti 3/19/96 Decl. ¶ 57M)

The absence of corroborative witnesses was explained in various ways. Cerruti's father was at home and had not been asked to testify because,

> He, at the present, he's been fairly ill lately. He gets confused easily. He's getting on in years—I don't know if it would be helpful or not. I think he might just simply not remember a lot.

(7/10/96 Tr. 103) Not that it would matter much if his father did remember anything, because Cerruti testified elsewhere at the hearing, when his father's recollection as recorded at deposition differed from his own, that his father either had misunderstood the question or was simply wrong. (E.g., id. at 46–49) On the other hand, Cerruti testified also that his father had prepared defendants' 1993 and 1994 tax returns himself. (Id. at 124) Other potential witnesses either were in foreign climes (id. at 119), were deemed unnecessary by Cerruti (id. at 117), or "don't want to get involved." (Id. at 128)

Of course, Lillian Wachsler was unavailable to this or any other earthly court in July 1996, although when she had become so was a matter of dispute at the hearing. It was important to determine when she had died because if the date of her death, as suggested by defendants' former accountant, had been well before 1995, then presumably there would be another—living—witness who could provide relevant information. Cerruti continued to insist that she had retired in the fall of 1995 and had died shortly thereafter, and denied it was possible that she died in March 1990: "Unless I had a ghost working

for me, no." (7/10/96 Tr. 8, 69) He was then confronted with a document from the LEXIS Deceased database, which relies on Social Security Administration records, reflecting that Lillian Wachsler had died in March 1990 (DX X), and was asked whether that was the same person who had worked for his company. His response was simply to deny that the record was accurate:

> A. I don't know how that could be possible.
>
> Q. Because she didn't die until last fall. Is that your testimony?
>
> A. That's right. You're showing here 1990. How could it be?

Then, as he did repeatedly during the hearing[2], Cerutti added "corroborative detail, intended to give artistic verisimilitude to what would otherwise be a bald and unconvincing narrative"[3]:

> However, I can tell you something very interesting about the Social Security Administration that recently happened to me. However, I'm not sure this is the case or not. I recently applied for a lease on my automobile and I had a slight problem with it because it showed up that I was deceased. And if you run my Social Security number through that form, you're going to show me as deceased. I'm still trying to straighten that out. It hasn't caused me too big a problem because obviously it shows activities with my deceased date. [sic]

(7/10/96 Tr. 71–72) I have searched the Westlaw database that contains the same information as the LEXIS database referred to at trial; both can be searched by name as well as by Social Security number. The Westlaw database does not reflect that anyone named Leo Cerruti is deceased. It does reflect that the only deceased person in the United States named Lillian Wachsler died a resi-

---

**2.** E.g., 7/10/96 Tr. 26 (he did not wish to produce records later shown to be inaccurate), 43–44 (numerous people, who cannot be located, had authority to hire at warehouse, and workers were paid in cash), 84 (he regularly throws leases away).

**3.** Thus did Pooh–Bah, the Lord High Everything Else in Gilbert and Sullivan's The Mikado, describe his own fanciful claim that the severed head of one of the Lord High Executioner's vic-

tims had bowed three times to him out of deference to his pedigree. As was true, mutatis mutandis, of Cerruti's testimony at the hearing, not only had the head not bowed even once, but indeed there had been no head at all because the execution itself had not taken place. W.S. Gilbert and Sir Arthur Sullivan, The Mikado, Act II, in The Complete Plays of Gilbert and Sullivan 337 (W.W. Norton & Co. 1941).

dent of Flushing, New York on March 23, 1990.

## D. The October 11, 1996 Hearing

On October 11, 1996 I heard testimony from Henry Kee, a court-appointed expert, Fed.R.Evid. 706, who is a consultant with respect to computers. Kee had examined the Syquest disk that Cerruti blamed for the unreliable records Cerruti supplied during discovery (see supra at 575), as well as Cerruti's own Macintosh computer. Although Kee had far less experience with Apple computers than with IBM hardware (10/11/96 Tr. 5–6, 38), and his experience with the Panorama software on Cerruti's computer was limited to this case (id. at 39), he was able to examine the files on both the computer and, to a limited extent, on the disk. Whatever his lack of facility with the particular programs involved here, I believe it affected only the extent of his findings, not their validity.

Kee was able to determine that the data in the relevant files on the Syquest disk (PX BB) had been compressed through the use of a test program that was not available to him when he visited Cerruti's premises or otherwise, and therefore he was not able to open those files so as to gain ready access to them. (10/11/96 Tr. 9–10) However, he was able to locate the same files on the hard drive of Cerruti's computer, and to compare both the size of those files and some data in them to the size of the files on the Syquest disk and to corresponding data in those files. Kee was able also to compare the data on the hard drive of Cerruti's computer to the records he produced, and to find that the records produced matched "perfectly" what was on that hard drive and apparently also what was on the Syquest disk. (Id. at 15–16, 28)

Kee was able to determine also that the Syquest disk Cerruti had blamed for the defective records was not itself defective (id. at 16–17), and that the random numbers in the name and address fields of the 1995 records in Exhibit B had been manually inserted. (Id. at 21–22, 36) He explained why the appearance of these numbers could not have been caused by a hardware failure that would simultaneously leave all other data, including correct price and quantity totals,

completely unblemished. (Id. at 28–30) He explained also that this apparent anomaly in the data was "highly unlikely" to have occurred during the process of copying the data from Cerruti's hard drive to the Syquest disk because the anomaly was identical in both the hard drive and the disk. (Id. at 43)

Kee noted also that the span of invoice numbers covered by the mail order records defendants produced is about 14,000, whereas only 2622 separate records were produced. (Id. at 32) Although Cerruti's counsel suggested on cross-examination that the computer could have been instructed to delete records with names that appeared earlier, so that a purchaser's name would appear only once, and Kee agreed that such a command could produce that result (id. at 50), that would still not explain why that instruction might be given when the result would be to produce dramatically fewer than all sales records, which result would conflict with Cerruti's own testimony at the July 10 hearing that he thought "the number of records or sales slips is probably correct." (7/10/96 Tr. 23)

Kee's testimony provides ample basis for concluding that Cerruti fabricated records, but not the only basis. To that testimony must be added the pattern of Cerruti's falsehoods described above and defendants' awareness from its loss in the Charvet litigation of the importance of submitting records to prove use of a mark. Indeed, this case seems to resonate with that earlier litigation through Cerruti's claims of deceased witnesses and missing records. Charvet, supra, 568 F.Supp. at 475. Accordingly, I conclude that the random numbers on the 1995 records were generated purposely by Cerruti to prevent customers from being surveyed as to whether they had bought merchandise from defendants during the relevant period, and that Cerruti manipulated the data on the Syquest disk with software that he did not make available to Kee in order to throw off pursuit. Which is to say, Cerruti fabricated records and then tried to prevent such fabrication from being detected.

## II.

Beyond the powers conferred expressly by rule and statute, a federal court

has inherent power to sanction a party for bad faith litigation conduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123, 2133–34, 115 L.Ed.2d 27 (1991). Such sanctions may include not only, as in *NASCO*, attorneys' fees occasioned by the conduct in question, but also entry of judgment against the offending party. *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 391 (2d Cir.1981).

█ Cerruti 1881 argues that defendants' conduct here is so flagrant as to warrant the ultimate sanction of a judgment against defendants, as well as costs and fees. Defendants do not dispute the court's authority to impose such sanctions, but argue that the evidence of purposeful conduct is sufficiently murky to stay the court's hand, and that because they withdrew the disputed records, they have inflicted no serious harm on the fact-finding process. (*E.g.*, Def't. Post–Hearing Mem. at 3) In essence, they invoke the playing field principle of no harm, no foul.

However, defendants did not withdraw the documents on their own. Rather, they waited until the falsity of the documents had been detected. Moreover, even accepting defendants' argument insofar as it describes their pre-hearing course of conduct, it does not take into account the tergiversations of Leo E.Q. Cerruti at the hearing.

The Court of Appeals has cautioned numerous times that there is a strong preference in the law for resolving disputes on the merits and not by default, and that judgment against an offending party is appropriate only in extreme circumstances. *Marfia v. T.C. Ziraat Bankasi, New York Branch*, 100 F.3d 243, 248–49 (2d Cir.1996) (collecting cases). The circumstances here are extreme because we are dealing here with repeated rather than with isolated or discrete abuses. Further, it is apparent that defendants' misconduct did not concern a peripheral or an incidental matter, or result simply in imposing substantial burdens on the other side. Rather, that misconduct goes to the heart of the case by making it apparent that defendants can rely only on fraudulent or defective records, and the unsubstantiated claims of a proven liar, to establish that they did not abandon the marks in question.

Section 45 of the Lanham Act provides in pertinent part:

> A mark shall be deemed to be 'abandoned' if … the following occurs:
> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. 'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C.A. § 1127 (1994 & Supp.1996). Although the statute has been amended since *Silverman v. CBS, Inc.*, 870 F.2d 40 (2d Cir.), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989), I do not believe those amendments in any way undermine the authority of that case, which articulated the standards for determining abandonment in this Circuit. Those standards are non-use of the mark by the legal owner and no intent by that owner to resume use in the reasonably foreseeable future. *Id.* at 45. The presumption can be rebutted. For example,

> A proprietor who temporarily suspends use of a mark can rebut the presumption of abandonment by showing reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate.

*Id.* at 47.

Defendants, however, have insisted that they did not suspend use of the mark. Yet the proof they have adduced that there was no suspension is permeated with fraud. There is simply no credible proof that defendants made bona fide use of the marks in question in the ordinary course of trade for at least three years before they received defendants' July 25, 1995 notice that the 1974 agreement had terminated due to abandonment of the marks. Beyond the fraudulent proof of past use, defendants have not adduced any proof of intent to resume use. Because defendants' improper conduct shows also that they have no case on the issue of abandonment, it seems entirely appropriate to apply the ultimate sanction and to enter judgment for plaintiffs on their claims.

It is also proper on this record to assess costs and attorneys' fees, because defendants' conduct led plaintiffs' counsel on an arduous chase. Accordingly, upon a showing consistent with the requirements of *New York Ass'n. for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983), plaintiffs will recover the costs and fees occasioned by defendants' wrongful conduct.

Plaintiffs have sought also the entry of judgment dismissing defendants' counterclaims. To the extent defendants allege that plaintiffs infringed defendants' marks, whether in violation of the 1974 agreement or otherwise, such claims cannot stand because defendants are found to. have abandoned their marks. Therefore, defendants' First, Third, Fourth and Fifth counterclaims must be dismissed. In their Second Counterclaim, defendants claim Cerruti 1881 failed to pay sums allegedly due under the 1988 agreement for sales of ties in the United States. If sums were due under that agreement and were not paid, there is nothing in defendants' subsequent conduct that should erase their entitlement to those sums. The court will confer with the parties to determine an expedient way to account for the sales in question.

As noted earlier in this opinion, defendants' attorney, Andrew Baum, Esq., was in no way implicated in his client's improper conduct. To the contrary, he sought to withdraw when it first appeared that defendants' sales records were not legitimate. I refused to permit him to withdraw out of concern that that would delay resolution of the case. When the court compelled him to continue, he squared his shoulders and did his duty in a difficult situation, pursuing all arguments and all remedies that one would expect to be pursued by diligent but not captious counsel. His conduct throughout has been exemplary.

For the above reasons, judgment will be entered for plaintiffs as to all claims in their complaint, and against defendants dismissing all but their Second Counterclaim.

SO ORDERED.